IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

Indy Bostick,                          )
                                       )
                    Plaintiff,         )      Civil Action No. 9:09-02738-RMG-BHH
                                       )
          vs.                          )
                                       )      **REPORT AND RECOMMENDATION**
                                       )      **OF MAGISTRATE JUDGE**
                                       )
Beaufort County,                       )
                                       )
                    Defendant.         )
_____)

This matter is before the Court on the defendant's motion for summary judgment [Doc. 21] pursuant to Federal Rule of Civil Procedure 56.  The plaintiff brought this case alleging that the defendant failed to promote her because of her race in violation of Title VII of the Civil Rights Act of 1964.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTUAL BACKGROUND

The plaintiff, an African-American female, began her employment with the defendant in approximately 1978.  (Pl. Dep. at 14-15.) She worked in the County's Assessor's Office. The plaintiff began working full time in the Assessor's Office in 1981.  *Id.* The plaintiff was promoted from her initial position as a Data Entry Technician and eventually became an Appraiser I in 2000.  *Id.* at 23-24. She currently holds that same position.

At the time of her promotion to Appraiser I, the plaintiff did not have a license to be an appraiser or even an apprentice permit.  *Id.* at 51, 59, 91, 95, 105.  Her duties included going to mobile home sites to verify the mobile home was still there, photograph it, note the color of it, and measure and sketch any additions or renovations since the last reappraisal, but she did not actually value the property.  *Id.* at 28.

The plaintiff obtained an "appraiser apprentice" permit on or about June 2000. *Id.* 105 and Ex. 1 thereto). Although Bostick had the title of "Appraiser" as designated by the County, she could not actually perform appraisals according to state law. Rather, as an "appraiser apprentice" (for licensing purposes), she could "perform appraisal assignments only under the direct supervision of a state certified appraiser." S.C Code Ann. §§ 40-60-20, -34(B)(1). That permit eventually expired on June 30, 2005. For reasons, which will later be discussed, its renewal at that point was not simple. It is enough at this point to say, that, as of that date, the plaintiff could not perform appraisal work at all unless she had either obtained a license or repeated the process to obtain another apprentice permit. *See* S.C. Code § 40-60-200. The plaintiff did not receive her full appraiser's license until December of 2007. (Ex. 1-3 to Sanders Dep.)

In November 2007, the defendant posted two Appraiser II positions. (Hughes dep. 77:8-19, Ex. 3.) The next month, the plaintiff applied for them. (Exs. 16, 17 to Pl. Dep.) She was not interviewed for those positions, however, because she did not have an appraisers license. The positions were awarded to two external hires, Mark Gray and Louis Zeller, both white males. (Hughes Dep. Exs. 9, 10.)

Zeller was later also promoted to an Appraiser III position, for which the plaintiff also applied and was rejected. Zeller was chosen for his supervisory experience. (Hughes Dep. at 52; Sanders Dep. at 17; Reames Aff. ¶ 7; Boswell Aff. ¶ 8.) It is undisputed that the plaintiff had none and, therefore, was rejected. (Hughes Dep at 89; Bostick Dep. at 138 and Ex. 15 [Doc. 21-4].)

Ed Hughes became the County Assessor effective September 26, 2005. (Pl. Dep. at 72; Gregory Aff. ¶ 3.) He is the focus of the plaintiff's accusations concerning the defendant's alleged discriminatory treatment of her. She contends that his discriminatory animus is the reason for the defendant failing to promote her on both occasions. She points

2

to various comments and behavior of Hughes, which allegedly evidence his bias. During a meeting in October 2007, the plaintiff called Hughes a "dictator" because she disagreed with the way he was handling some employee benefits and classes the Appraisers needed to take. (Pl. Dep. at 173-76; Sanders Dep. at 79.) Shortly thereafter, Hughes told Ebony Sanders (Bostick's direct supervisor at the time) that the plaintiff better pass the appraisal examination or she would be discharged, and even if she passed, he was not going to promote her. (Hughes Dep. at 43-45; Sanders Dep. 80.) The defendant emphasizes that this is the real reason that the plaintiff believes she was not promoted. (Pl. Dep. at 176-77.) The plaintiff contends it was her race. The defendant, as will be explored, believes she was unqualified for all of the positions, Appraiser II & Appraiser III.

## APPLICABLE LAW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is

3

entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

## DISCUSSION

The plaintiff has pled a single cause of action for failure to promote.  She complains that she was discriminated against on account of her race in that the defendant denied her request for promotion to the Appraiser II and Appraiser III positions. The plaintiff alleges that the defendant rejected her applications because she is black.

As the Fourth Circuit has explained, the plaintiff may avert the defendant's summary judgment motion and establish her failure to promote claim "through two avenues of proof." *Diamond v. Colonial Life & Acc. Ins. Co.*,  416 F.3d 310, 318 (4th Cir. 2005) (quoting *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (emphasis added).  A plaintiff can survive a motion for summary judgment by presenting direct or

4

circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race or gender motivated the employer's adverse employment decision. *Diamond*, 416 F.3d at 318. Pursuant to the 1991 Act, the impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice. *See* 42 U.S.C.A. § 2000e-2(m).

Alternatively, a plaintiff may "proceed under [the McDonnell Douglas ] 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285. The plaintiff does not attempt to establish her discrimination or retaliation claim using direct or circumstantial evidence but relies exclusively on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting proof scheme.

Under *McDonnell Douglas*, an employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If she succeeds, the employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802-05.

### A.  *Prima Facie* Case

To establish her *prima facie* case of a discriminatory failure to promote, the plaintiff must show: (1) that she is a member of a protected class; (2) that she applied for the position in question; (3) that she was qualified for that position; and (4) that the defendant rejected her application under circumstances that give rise to an inference of unlawful discrimination. *See Bryant v. Aiken Reg. Med. Ctrs., Inc.*, 333 F.3d 536, 544-45 (4th Cir. 2003); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir.1995).

The defendant contends that the plaintiff cannot establish either the third or fourth elements of her *prima facie* case. The fourth element, however, is established by virtue of the fact that the Appraiser II and Appraiser III positions were filled by white applicants. Mark Gray and Louis Zeller, white males, were hired for the Appraiser II positions in February 2008. (Hughes Dep. Exs. 9, 10.) Zeller was again selected for the Appraiser III position.

At times the Fourth Circuit has said that it is simply not enough that the plaintiff is a black female and that the promotion was given to a white male. *See Holmes v. Bevilacqua*, 794 F.2d 142 (4th Cir. 1986). "[T]he naked fact that one not in the protected class receives the benefit sought by the protected plaintiff, or is spared the hardship the plaintiff hoped to avoid, cannot be sufficient to satisfy the purposes of the fourth McDonnell-Douglas prong." *Barnhill v. Aratex Services, Inc.*, 1987 WL 44690, at *2 (4th Cir. August 28, 1987) (citing Holmes). To satisfy the fourth element, the plaintiff must point to "some evidence that race was a determining factor in the employer's decision." *Holmes*, 794 F.2d at 147.

But, other and more recent Fourth Circuit cases have suggested that to satisfy the fourth prong the plaintiff "need only show that the position was filled by a white applicant, as he has done." *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994); *see also Blue v. United States Dep't of the Army*, 914 F.2d 525, 537 (4thCir.1990). That appears to be an undisputed fact, here – that the positions were, in fact, filled by white applicants.

For that reason, the Court would, as it has in the past, acknowledge the presence of evidence establishing the fourth element of the plaintiff's *prima facie* case.

Whether or not she has created issues of fact as to the third element of her *prima facie* case is somewhat more complex. The Fourth Circuit, however, has instructed that "the burden of establishing a *prima facie* case of disparate treatment is not 'onerous.'" *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir.1996) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

6

There does not appear to be any written criteria for the Appraiser II and III positions submitted by the parties. Instead, the defendant has relied on the expectations Hughes had for the positions. Generally, that is an appropriate source of job criteria. An employee "must compete for the promotion based on the qualifications established by her employer." *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 269 (4th Cir. 2005).

Regarding the Appraiser II positions, Hughes has indicated that he wanted a licensed appraiser. (Hughes Aff. ¶ 11.) It is undisputed that the plaintiff was not licensed when she applied for the Appraiser II position in 2007. (Bostick Dep. at 51); [Doc. 21-11.] The defendant has expressly indicated that this was the reason the plaintiff was unqualified for the position. (Def. Reply at 1; Ex. 16 to Pl. Dep; Hughes Dep. 50.) The only problem with this explanation is that Zeller, selected for the Appraiser II position and eventually for the Appraiser III position, did not have a SC appraiser's license when hired as an Appraiser II and had a lapsed SC license at the time of promotion to Appraiser III. (Sanders Dep. 76-78.) Also, the plaintiff was, in fact, ultimately licensed prior to the time of the final promotion decision regarding the Appraiser II position. (Ex. 1-3 to Sanders Dep.) The defendant goes to some persuasive length to distinguish the circumstances around the lapse of Zeller's license as compared to that of the plaintiff's. For instance, Zeller was a licensed appraiser in *Georgia* when he became an external hire for the Appraiser II position in February 2008. [See Doc. 21-7 Hughes Dep. Exs. 4-5.] Also, Zeller's SC license apparently lapsed due to an inability to schedule necessary classes in the summer of 2008 and not for any dereliction on his part. (Hughes Supp. Decl. ¶ 24.) The Court will discuss it more under the pretext analysis but believes it is enough to say, at the *prima facie* stage, and in consideration of the plaintiff's light burden to establish it, that the plaintiff has produced evidence that creates issues of fact as to whether the stated basis for her disqualification from the position is true where the person promoted to the position suffered the same disqualifying condition – a lapsed or missing SC licensure. Again, the Court, in

this ruling, is not weighing the relative reasonableness to treat the circumstances of Zeller's lapsed license and the plaintiff's comparably. The defendant itself has made a fairly unserious stand at the third element of the plaintiff's *prima facie* case. (See Def. Mem. Supp. Mot. Summ. J. at 24.)

Concerning the Appraiser III position, as a supervisory role, Hughes wanted the successful candidate to have had supervisory experience. (Hughes Dep. at 52; Sanders Dep. at 17; Reames Aff. ¶ 7; Boswell Aff. ¶ 8.) It is undisputed that the plaintiff had no supervisory experience. (Hughes Dep at 89; Bostick Dep. at 138 and Ex. 15 [Doc. 21-4].) The plaintiff has emphasized that, in her 20 years of experience, she had mentored and trained new appraisers while still performing her duties. (Pl. Dep. at 191-192.) She admits, however, that this is not any sort of technical supervisory experience nor does she dispute that the Appraiser III position requires such experience or that Zeller had it. (Pl. Resp. at 9.) Accordingly, the Court does not believe that the plaintiff has created any issues of fact as to whether she was qualified for that position. Thus, the Court would not recommend that she can establish a *prima facie* case in regards to the defendant's decision to reject her for Appraiser III position.

Only the plaintiff's claim based on her rejection for the Appraiser II position should survive for further consideration at latter stages of the *McDonnell Douglas* paradigm.

**B.    Legitimate Non-Discriminatory Reason**

The defendant has met its burden to produce a legitimate, non-discriminatory reason for rejecting the plaintiff's application for the Appraiser II position insofar as it has stated that the plaintiff was not qualified. (Hughes Aff. ¶¶ 2, 4, 7.) Specifically and as already discussed, the defendant wanted a licensed appraiser to fill the Appraiser II position. (Hughes Aff. ¶ 7.) When the plaintiff applied for the Appraiser II position, she was not licensed, and therefore, was not interviewed. (Bostick Dep. at 51; Hughes Dep. at 77.) Also, the plaintiff called Hughes a dictator a month prior to applying for the Appraiser II

position. (Bostick Dep. at 176-77.) As a result, Hughes concluded that the plaintiff was not a leader or a team player, requirements of the Appraiser II position. (Hughes aff. ¶ 2.) The defendant also has stated that, although the plaintiff had worked at the Assessor's Office for approximately twenty years, she had very limited actual appraisal experience. For example, the defendant highlights that she has never completed a written "Self-Contained, Summary Appraisal" or "Restricted Use" appraisal report. (Hughes Aff. ¶¶ 5-6.) Apparently she had also never completed the typical appraisal report used for residential classed property in assessment administration review proceedings, which is the URAR (Uniform Residential Appraisal Report). *Id.* There is also evidence that the plaintiff was in the lower quartile regarding the number of appeals processed and that she takes too long to process an appeal. (Hughes Aff. ¶ 10.)

"Job performance and relative employee qualifications [are] widely recognized as valid, non-discriminatory bas[i]s for any adverse employment decision." *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see also Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004); *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1998) ("Inova's termination of Karpel was based on her unsatisfactory job performance, including, her tardiness and failure to complete her monthly summaries.")

### C.    Pretext

Because the defendant has proffered legitimate, non-discriminatory reasons for its actions, the plaintiff bears the burden of demonstrating that the real reason for denial of the promotion was, in fact, an unlawful one. *See Reeves*, 530 U.S. at 142-43.    As is most common, the plaintiff attempts to satisfy this burden by suggesting that the defendant's proffered reasons are pretextual or false. *See id.* at 144. Specifically and principally, the plaintiff contends that the reason for her disqualification must necessarily have been false because the individual selected, Zeller, suffered the same deficiency – no license – that she

did. In fact, as detailed, Zeller was without a license when he was hired for the Appraiser II position and promoted to the Appraiser III position. And, the plaintiff eventually became licensed during the process of hiring for the Appraiser II decision. (Ex. 1-3 to Sanders Dep.)

So, the plaintiff has not made an actual qualifications argument. In other words, she does not attempt to prove pretext by showing that she was, in fact, so dramatically more qualified than Zeller that discrimination could be reasonably inferred from her rejection. If she were, and as the defendant directs, the plaintiff would be required to show that her "qualifications [were] **demonstrably superior**" to that of Zeller's and not just "similar or only slightly superior." *Heiko v. Columbo Savings Bank, F.S.B.*, 434 F.3d 249, 261-62 (4th Cir. 2006) (emphasis added). The plaintiff has not made any attempt to argue that she was more qualified than Zeller, demonstrably so or otherwise.

Instead, she has simply cast aspersions on the veracity of the explanation. This is appropriate. The United States Supreme Court has indicated that the sheer "falsity" of the reason in combination with the *prima facie* case is enough to establish pretext. *See Reeves*, 530 U.S. at 147; *Anderson,* 406 F.3d at 269. Said differently, the plaintiff has posited that her failure to have a license cannot possibly be the true reason for the defendant's rejection of her because Zeller also was without licence, yet, still hired and promoted. The Court would include, in fuller detail than already provided, the defendant's response. In short, the defendant would characterize the plaintiff's failure to be properly licensed as a function of negligence and an endemic condition whereas Zeller's was merely a technical and short-lived fact.

The defendant has produced the following concerning the lapse of the plaintiff's license. The plaintiff obtained an "appraiser apprentice" permit, on or about June 2000. (Pl. Dep. at 105 and Ex. 1 thereto). As an "appraiser apprentice" (for licensing purposes), she could "perform appraisal assignments only under the direct supervision of a state certified appraiser." S.C Code Ann. §§ 40-60-20, -34(B)(1). The plaintiff's apprentice permit expired

annually on June 30, and could be renewed four times only. (Pl. Dep. at 59); *see also* S.C. Code Ann. § 40-60-34(G).  By June 30, 2005, it expired for the last time and could not be renewed. Thus, as of that date, the plaintiff could not perform appraisal work at all unless she had either obtained a full appraisal license or repeated the process to obtain another apprentice permit.  *Id.* § 40-60-200.  She did neither. (Pl. Dep. at 94.)  The Court would pause and interrupt itself briefly to indicate that this appears a fairly stunning fact.  Maybe it is more common than the Court can understand for this industry, but it seems a remarkable fact that the plaintiff would have allowed to expire, the permit upon which her job depends, four times to the very statutory limit allowed, without pursuing additional licensure.  In support of the view that such circumstances seem unacceptable, the defendant has indicated that the plaintiff made worse the lapse of her permit by failing to inform the County that she had let it lapse and, therefore, unbeknownst to the County, was performing appraisal work without a permit or license, in violation of state law.  The plaintiff complains that it was the defendant's job to track such things.  Without needing to precisely resolve it, the Court would simply observe that it seems a dual responsibility, in the least.

The plaintiff claimed she had no particular reason for letting her permit lapse without obtaining her license or for failing to notify the County that her permit had lapsed, but she knew it was important to have a license, and she wanted to keep working for the County as an Appraiser. (Pl. Dep. at 94-95.) Between 2000 and 2005, the plaintiff was encouraged to get her appraiser's license, but she did not even attempt the examination until 2005 when she failed it twice. *Id.* 91 and Ex. 4 thereto.  She had scheduled the examination three other times in 2005 but it does not appear that she took the examinations as scheduled. *See* Ex. 4 to Pl. Dep.

In October 2005, Deputy Assessor Bobby Reames learned from a County Appraiser that the plaintiff's apprentice permit had expired.  (Reames Aff. ¶ 4.)  He instructed the plaintiff and another supervisor to stop the plaintiff from performing any activity related to

11

appraisal valuation, to verify the status of her permit, and to confront her as to the reason she let her permit expire without getting licensed and the reason she did not inform the County. *Id.* On October 10, 2005, Reames informed Hughes that the plaintiff had knowingly let her apprentice permit lapse in June 2005 and had failed the licensing exam. (Hughes Dep. at 36, 115; Reames Aff. ¶ 5.) Hughes was alarmed at the news and told Reames to instruct Bostick to "cease and desist all activities relative to any activity that could be construed or misconstrued to be appraisal related and instructed her to retake the required minimum 75 hours to reinstate her appraiser apprentice permit." (Hughes Dep. at 37; Bostick dep. 96.) The plaintiff admitted that the permit was expired and explained that she was waiting to see what was going to happen with the assessor position. (Boswell Aff. ¶ 3.) She was told that she would have to reobtain the apprentice permit at her own expense. *Id.* The plaintiff was subsequently upset that the defendant was not going to pay a second time for her to take the 75 hours of classes she needed to reobtain an apprentice permit. (Pl. Dep. at 99-101;) S.C. Code Ann. § 40-60-100(2)(a). The defendant has indicated that the County typically pays for the appraisal staff to take the classes needed to obtain and maintain their appraisal permit or license.

Hughes, however, was angry that the plaintiff let her apprentice permit expire, particularly without notifying the County, and he was concerned that she had been unable to pass the appraisal licensing examination during her five-year apprentice period. (Hughes Dep. at 39-40.) The plaintiff is the only employee who remained with the Assessor's Office for the five-year apprentice period and did not obtain an appraisal license. (Hughes Dep. at 31-32.) In Hughes's experience in South Carolina, it was "atypical of an appraiser apprentice to have to re-up for their appraiser apprentice permit without securing some level of licensure in that first five years." *Id.* 39. Thus, Hughes (directly and through his management staff) repeatedly instructed the plaintiff to take the licensing examination, but she refused to do so or to inform Hughes when she planned to take it. (Pl. Dep. at 107-09.)

12

As discussed, the plaintiff failed two examinations in 2005 and postponed taking two or three others.  (Pl. Dep at 91, 94-95 and Ex. 4 thereto.)

On May 8, 2006, the plaintiff was requested to update Hughes on the status of her taking the licensing examination.  (Ex. 5 to Pl. Dep.)  The plaintiff responded,

> I am sure you know my [apprentice permit] is good for the next five years. I am currently studying for the licensing exam. Is there something I need to be aware of regarding my employment and or license? **I find myself in the position where my salary exceeds the starting salary of an Appraiser II, due to longevity. Therefore, I am wondering what would be the benefit of me pursuing the next level of licensure immediately**, except of course for my own personal satisfaction. I have asked this question before and I have yet to receive an answer. Thus far, I have nothing concrete to hang my hat on.

(Ex. 6 to Pl. Dep. (emphasis added).)  In other words, the plaintiff was electing to feel no urgency about her license or the consequences of not having one; she appears to have viewed salary as largely the only benefit, even as compared to the opportunity of an Appraiser II position, specifically.

Hughes e-mailed Bostick on May 11, 2006, asking her to confirm that she planned to take and pass the licensing examination by June 1, 2006. (Ex. 7 to Pl. Dep.) On May 15, 2006, the plaintiff confirmed she would take the examination by July 31, 2006.  *Id.* Ex. 8. On July 28, 2006, the plaintiff was asked to confirm that she had registered to take the licensing examination. (Ex. 9 to Pl. Dep.)  On July 31, 2006 – the deadline Hughes had imposed for the plaintiff to have passed the licensing examination – she responded that she had not received a reply from Labor, Licencing & Regulation ("LLR") so that she could schedule the examination, but that she would notify the defendant when she received her examination results.  *Id.* Ex. 10.  In fact, it appears that the plaintiff had not actually applied to LLR to take the licensing examination. [Doc. 21-11 at 82-83.]  She did not do so until July 31, 2006 – the deadline Hughes imposed for her to have passed the exam – and LLR

13

received the application on August 9, 2006. *Id.* LLR approved the plaintiff to sit for an appraisal licensing examination from August 9, 2006 through August 9, 2007. *Id.* at 84.

On October 19, 2006, the plaintiff was again asked about her plans to take the licensing examination. (Ex. 12 to Pl. Dep.) She responded that she had just started studying for the examination and planned to take it sometime before the end of November 2006. *Id.* But, by October 2007, more than a year after the deadline Hughes had set for the plaintiff, she had still not taken the licensing examination.

Nonetheless, the plaintiff applied for the Appraiser II position on December 21, 2007, without an appraiser's license. (Ex. 16 to Pl. Dep.) But, six days later she finally took and passed the certified residential examination for it. (Exs. 1, 2 to Sanders Dep.)

In contrast to the tortured history surrounding the plaintiff's acquisition of a license, the defendant has described the circumstances of the lapse in Zellers' license as follows. Zeller's South Carolina appraisal license was activated effective April 8th, 2008. (Hughes Supplemental Decl. ¶ 24.) South Carolina appraisers are licensed for the state's fiscal year, which expired June 30, 2008. *Id.* Thus, Zeller had from April 2008 until June 30, 2008 to satisfy South Carolina's newly increased continuing education requirements. *Id.* He took three hours in May 2008, but could not obtain the other six because the classes were already full when he applied for them. *Id.* Apparently, the State had underestimated the demand for the classes and had to add some additional classes for approximately twenty appraisers who had not been able to take the required classes on time. *Id.* Zeller's license was inactivated July 1, 2008. *Id.* He immediately informed Hughes of the situation, and Hughes assigned him some nonappraisal duties for the couple of weeks his license was inactive. *Id.* As soon as Zeller could get into the classes he needed, he did so, and his license was reactivated July 23, 2008. *Id.* The defendant also highlights that Zeller had been licensed for years in Georgia and that he had owned and operated his own appraisal business. (Exs. 4-5 to Hughes Dep.)

Respectfully, the plaintiff's response to the defendant's account is confusing. She is largely dismissive of the defendant's account contending that the matter of her apprentice license had long been resolved in 2005. She contends that any of her "perceived past wrongs were resolved at the time by her supervisors' declination of disciplining her." (Pl. Resp. at 13.) This is a fairly remarkable retort. The issue is not whether the defendant somehow wrongly delayed in disciplining her for the "past wrong" of her licensure failure such that it has abandoned, in laches or other theory, any right to contend she should not have let the permit lapse. Rather, the plaintiff is in this Court claiming that she was comparably qualified for, and entitled to, a position, that by all accounts required the appraiser's license, which she herself allowed to expire, did not renew, and then subsequently showed little interest in acquiring. The defendant did not belatedly punish the plaintiff; she chose not to be prepared, in qualification, for a position *she* wanted. The plaintiff claims she knows of no policy or requirement that she was to inform the defendant of her attempts at licensure. This epitomizes her misperception. The defendant does not contend that she violated any policy by not informing it of her efforts regarding licensure. Rather, she was ***not*** licensed. The fact that she may have been less than candid about her efforts, and delayed over almost seven years in doing so, is simply emphasized by the defendant as a point of reference for excusing Zeller's behavior and situation, who was without a license for only a matter of months, and not hers.

On balance, the Court is largely sympathetic to the case of the defendant. The evidence of record suggests that the defendant had reason to treat Zeller and the plaintiff's situations quite differently such that its explanation for rejecting her seems truthful not false. It can hardly be imagined that any reasonable jury could view the facts of the two situations similarly enough such that it would interpret the defendant's actions as having held the circumstances of the plaintiff to account differently than it did Zeller in a way that

15

meaningfully implies pretext or untruthfulness.  The plaintiff's failure to be permitted was *chronic*.  Zeller's was incidental.

But, the Court cannot weigh the facts.  They are convoluted and in dispute on their margins, including the parties' disagreement over the emphasis placed on the plaintiff to acquire the license.  Most critically and the fact upon which the pretext analysis hinges for the Court, the plaintiff was, in fact, licensed at the time of the  Appraiser II decision.  (Ex. 1-3 to Sanders Dep.)  Zeller was not.  (Hughes Supplemental Decl. ¶ 24.)  Even still, the plaintiff was pulled from consideration for an interview.  (Sanders Dep. at 72-74.)  Although he disputes it, the plaintiff has submitted evidence that Hughes was aware that she had passed all of the required exams and that the required paperwork had been submitted to the LLR prior to the Appraiser II decision.  (Sanders Dep. 69-72; Bostick Dep. Ex. 16).  So there exists cause to find the legitimate, non-discriminatory reason for not promoting her to the Appraiser II position – that she was not licensed – false.  No matter how the defendant might explain the difference in treatment, there is at least some evidence from which a jury might disbelieve that explanation.  This seems enough.

The plaintiff has put forward other bases for pretext, including various statements which portend to be racist or discriminatory in nature ("hog mauls and fatback" and "hoeing out their office").  (Pl. Resp. at 16.)  The Court need not address them specifically.  There is no issue of fact concerning their meaning; they are not discriminatory.  No reasonable jury could conclude differently.  The plaintiff does emphasize certain emails which require some consideration.

In an email to Hughes in May 2006, Milton Boswell, a Chief Appraiser and supervisor of other appraisers, stated, "Bobby can probably confirm that we need to be careful how we handle her [the plaintiff] as she might scream 'discrimination' if we force her to take the exam."  (Ex. 14 to Hughes Dep.)  Boswell sent another email in March 2007 to Hughes with subject line "Status of Indy" in which he stated his belief that the plaintiff would not inform

16

them when she planned to take the test "because she knows we will be asking her if she passed or failed. (It's a cultural pride thing) We won't know of the 10 times she's failed, only the time that she passes." (Ex. 16 to Hughes Dep.).

A court may consider stray comments that provide circumstantial evidence of discriminatory animus, in combination with other evidence, as a basis for pretext. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010); *Parker v. Magna Innertech-Spartanburg*, 2010 WL 5488599, at *9 (D.S.C. November 29, 2010); *Huang v. Gutierrez*, 2010 WL 93274, at *10 (D. Md. January 5, 2010); *see also Straight v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001) ("[T]hough such 'stray remarks' may be material to the pretext inquiry, 'their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question, or were made by nondecisionmakers.'"); *Warren v. Fort Lincoln Cemetery, Inc.*, 2001 WL 743199 (D.Md. June 26, 2001) (holding though employer's racial slurs were not direct evidence of discriminatory intent, the employer's "conduct may still support Plaintiff's case as circumstantial evidence of discriminatory animus" by employer).  In "the absence of a clear nexus with the employment decision in question, however, the materiality of stray or isolated remarks is substantially reduced."  *Merritt*, 601 F.3d at 300.

The defendant recommends other precedent supportive of a different conclusion that, as a matter of law, neither statement evidences racial animus. *See Butt v. Board of Trustees*, 83 F. Supp. 2d 962, 965, 968, 971 (C.D. Ill 1999) (suggestion that misunderstanding between employer and employee might be "cultural" did not evidence a discriminatory intent or establish pretext); *Walton v. Claybridge Homeowners Assoc.*, 2007 WL 2323181, at *1 (S.D. Ind. Aug. 10, 2007) (statement that "the City would need to proceed carefully in dealing with Walton because she was known to 'play[] a race card'" was not a discriminatory reference to plaintiff's race).  It is a close call.

Here, the statements were made by decisionmakers, about the plaintiff's license, and relate in some respect to her race.  They, of course, are not direct evidence as they do not relate to the ultimate employment decision.  *See EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992); *accord Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (gender discrimination case), *abrogated on other grounds, Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  And, the Court would not recommend that issues of fact as to pretext exist based on these statements alone.  But, in conjunction with the evidence concerning the plaintiff's failure to be properly licensed, they are of some value.

Ultimately, the evidence of some inconsistent treatment as between the plaintiff and Zeller may be enough for a jury to conclude that the defendant is being false in its explanation about the promotion decision.  That falsity is enough basis from which to infer discrimination.

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the defendant's motion for summary judgment [Doc. 21] be GRANTED in part and DENIED in part. Specifically, the defendant's motion, as to the plaintiff's failure to promote claim concerning the Appraiser II position, should be DENIED and, as to the Appraiser III position, GRANTED.

IT IS SO RECOMMENDED.

s/Bruce H.  Hendricks
United States Magistrate Judge

July 7, 2011
Charleston, South Carolina

18

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).